IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MATEEM MALIK HUDSON, #505868, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:23-cv-00591 |
| | ) | |
| CITY OF MEMPHIS, et al., | ) | JUDGE RICHARDSON |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Mateem Hudson, an inmate of the Trousdale Turner Correctional Center (TTCC) who proceeds pro se and in forma pauperis (*see* Doc. No. 5), filed this action under 42 U.S.C. § 1983 in the Western District of Tennessee in 2021. The original complaint alleged 20 claims against 26 defendants. The Western District performed an initial screening of the complaint under the Prison Litigation Reform Act (PLRA), dismissing some of its claims with prejudice and the remainder without prejudice, while granting leave to amend as to the latter. (Doc. No. 6 at 21.)

After securing two extensions of his amendment deadline, Plaintiff filed a "response" to the screening order. (Doc. No. 10.) Included in that response is a document titled "Plaintiff's First Amended Pleading." (*Id.* at 9–42.) The Western District treated this document as Plaintiff's amended complaint, directed the removal of all defendants from the case docket except the nine named therein, and transferred the case to this District because the remaining claims and defendants had no connection with the Western District. (Doc. No. 12 at 4.)

The Clerk of Court is **DIRECTED** to extract pages 9 through 42 from Doc. No. 10 and to

enter those pages on the docket as the Amended Complaint in this matter.

## II. INITIAL REVIEW OF THE AMENDED COMPLAINT

A. LEGAL STANDARD

The Amended Complaint is before the Court for initial review under the PLRA, 28 U.S.C. §§ 1915(e)(2), 1915A and 42 U.S.C. § 1997e(c). Pursuant to these provisions, the Court must dismiss the Amended Complaint or any portion thereof if it is facially frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. This initial review of whether the Amended Complaint states a claim upon which relief may be granted asks whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Applying this standard, the Court must view the Amended Complaint in the light most favorable to Plaintiff, *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009), while giving it a liberal construction in light of his pro se status. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure, *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989), nor can the Court "create a claim which [a plaintiff] has not spelled out in his pleading." *Brown v. Matauszak*, 415 F. App'x 608, 613 (6th Cir. 2011) (quoting *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975)).

B. ALLEGATIONS AND CLAIMS

Plaintiff alleges that, on January 30, 2021, he was in his cell at TTCC during lockdown when Correctional Officers Lauren Dillon, Raudy Rosario, and Joshua Burries opened the cell door and ordered Plaintiff and his cellmate outside of the cell. Dillon said to Plaintiff, "You know why we're doing a cell search, because I saw you jacking off." (Am. Compl., at 12.) Plaintiff responded by "quoting inmate handbook policies that permit an inmate to inquire into officers['] orders," and questioned the officers' right to conduct a cell search in response to masturbation by an inmate. (*Id.*) Plaintiff asked to speak with the officers' supervisor, and as he made that request, Officer Dillon "maliciously and sadistically sprayed 'mace' into Plaintiff Hudson's mouth, face, and eyes" in a burst that lasted 8–10 seconds. (*Id.*) Dillon deployed a second, shorter burst of spray (3–5 seconds) while Officers Rosario and Burries shouted at Plaintiff to get on the floor. (*Id.*) Rosario and Burress then entered the cell and placed Plaintiff in handcuffs. (*Id.*) After Plaintiff was on the floor and in handcuffs, Dillon sprayed him a third time with a short burst of mace. (*Id.*) The mace was sprayed on Plaintiff's "body, genitals, head, and hands," and caused skin irritation and burning in those areas as well as difficulty breathing. (*Id.*)

After Plaintiff was restrained in handcuffs, Dillon kicked him in the groin, chest, and back, while Rosario punched him in the back of the head and in the face. (*Id.* at 13.) After Rosario and Burries picked Plaintiff up off the floor, Rosario "maliciously and sadistically tightened his handcuffs and applied an illegal wrist lock to the right hand," causing pain and eliciting Plaintiff's complaint "that he was about to break his wrist." (*Id.*) Rosario escorted Plaintiff on a 10-minute walk to the medical unit, where Plaintiff collapsed at the entrance. (*Id.*)

Officer Lopez, a lieutenant (*see id.* at 11), was notified by Plaintiff that "Dillon, Rosario, and Burries assaulted [him] in retaliation for the incident with the female officer." (*Id.* at 13.) In

response, Lt. Lopez stated, "You must don't know what I do to inmates who jack off on my officers." (*Id.*) Lopez then prevented Plaintiff from receiving medical care and from being decontaminated, ordered that he would be decontaminated in segregation, and "conjured up a false report" to justify his transfer to segregated housing. (*Id.* at 14.) Plaintiff did not receive medical attention until "[s]everal days later," when a nurse on duty in segregation examined him and noted that he had superficial injuries to his head and wrist. (*Id.*) Plaintiff alleges that the blows to his face and forehead resulted in "lumps and contusions" and a broken tooth, and that he also suffered a laceration to his left wrist and multiple lacerations to his right wrist. (*Id.*) As a result of this incident, Plaintiff received a "disciplinary report" and was held in segregation, where he was confined to his cell for 23 hours per day. (*Id.*) He alleges that Dillon, Rosario, Burries, and Lopez "failed to properly secure plaintiff['s] cell when he was taken to medical and/or segregation, enabling other inmates to steal plaintiff's personal property" (*id.* at 18), and that "Defendant failed to remedy Plaintiff Hudson's Lost/Damaged/Stolen Personal Property Claim . . . by and through the deliberate indifferen[ce] . . . of Chief Unit Manager Dana Thomas on 02/19/21." (*Id.* at 15.)

Plaintiff alleges that, on February 4, 2021, in the segregation unit, Officer Burries confessed that he, Dillon, and Rosario agreed to do a retaliatory "shake down" of Plaintiff's cell and to leave it in disarray after Dillon saw him masturbating. (*Id.* at 14–15.) Burries stated that he only held Plaintiff's legs during the ensuing altercation, but that he knew Dillon went too far when she used her chemical spray on Plaintiff. (*Id.* at 15.)

Plaintiff alleges that the excessive use of force against inmates is "a pattern and practice" at TTCC that "resulted from a policy of defendant CoreCivic" and was "sanctioned by [Warden] Byrd wherein he failed to properly train and/or supervise the correctional officers." (*Id.* at 18.)

Plaintiff sues Dillon, Rosario, Burries, and Lopez in their individual capacity (*id.* at 10–11), asserting constitutional claims of excessive force and failure to protect him from harm, First Amendment retaliation, and cruel and unusual punishment (*id.* at 19–22, 39), as well as state-law claims of false arrest and imprisonment, intentional infliction of emotional distress, battery, and negligence. (*Id.* at 23, 37, 38.) He sues Warden Byrd in his individual and official capacities for failure to protect and, along with CoreCivic, for (1) failure to train/supervise, (2) maintenance of policies or customs of condoning the destruction or loss of prisoner property and the denial of necessary medical care to prisoners, (3) deliberate indifference to his serious medical and psychological needs, and (4) negligence. (*Id.* at 20, 24–38.) He seeks an award of damages against CoreCivic, Byrd, Dillon, Rosario, Burries, Lopez, and the Tennessee Department of Correction (TDOC). (*Id.* at 10–41.)

C. ANALYSIS

Plaintiff sues under 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Accordingly, the Amended Complaint must plausibly claim (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014).

 1. Excessive force and failure to protect

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits the use of excessive force against convicted inmates. The "core judicial inquiry" in considering such a claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously

and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). In addition to this subjective inquiry, there is also an objective component to Eighth Amendment excessive-force claims, which requires the pain inflicted to be sufficiently serious. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)). However, the Court may not apply a "de minimis injury" test to such claims, as "the judicial inquiry should focus on 'the nature of the force rather than the extent of the injury.'" *Williams*, 631 F.3d at 384 (quoting *Wilkins*, 559 U.S. at 34).

Presuming the truth of Plaintiff's allegations that Defendants Dillon, Rosario, and Burries subdued him by means of multiple bursts of chemical spray, the use of unreasonably tight handcuffs, and—after he was restrained—pinning his legs while multiple blows to his head, torso, and groin were administered and a "wrist lock" was applied, the Court finds that the serious nature of the force, the maliciousness of its application, and the seriousness of the resulting injury are colorably established for purposes of initial review. See Parsons v. City of New York, No. 17-CV-2707 (MKB), 2017 WL 2656135, at *3 (E.D.N.Y. June 19, 2017) (finding elements of excessive-force claim plausibly alleged where guard used mace against compliant prisoner, which satisfied subjective element as it "cannot be characterized as an attempt to maintain or restore discipline," and satisfied objective element insofar as prisoner "allege[d] that he suffered injuries beyond the immediate discomfort that results from being sprayed with mace") (citing cases). Further factual development may reveal otherwise and may even vindicate the level of force used by these Defendants. But at this early stage, Plaintiff's allegations are sufficient to allow his claim for excessive force to proceed against Dillon, Rosario, and Burries. That claim may be established whether these officers used force against Plaintiff themselves, or merely failed to protect him from another officer's use of force. *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) ("Our cases

teach that, in order to hold Officer Scott liable for the use of excessive force, Mrs. Turner must prove that he (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.") (citing cases).

However, Lt. Lopez is not alleged to have had a role in the use of force against Plaintiff, nor to have known when that incident occurred or that it was imminent. She is therefore not plausibly claimed, as a supervising officer, to have "encouraged the specific incident of misconduct or in some other way directly participated in it" as it was unfolding. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citation and internal quotation marks omitted). Though Plaintiff alleges such direct encouragement or participation, he does so only in conclusory fashion, and in the context of his claim that the use of force was retaliatory. (*See* Am. Compl., at 22 ¶ 109 (asserting that claim against Lopez is based on "her alleged authorization and approval, . . . and direct participation in the alleged retaliatory acts").) Conclusory allegations "devoid of further factual enhancement" cannot be presumed true, *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and therefore are insufficient to support a plausible claim.

However, the Amended Complaint does contain non-conclusory assertions of Lopez's supervisory liability, when it alleges that she endorsed the use of excessive force after the fact by stating, "You must don't know what I do to inmates who jack off on my officers," and then "unlawfully transferred Plaintiff Hudson to segregation for reasons unrelated to a legitimate correctional purpose." (Am. Compl., at 22 ¶¶ 110–111.) Supervisory liability may be plausibly claimed if, "at a minimum," the supervisor is alleged to have "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300).

Although Defendant Lopez's actions were taken in the wake of the use of force against Plaintiff, allegations of subsequent "fail[ures] to investigate the allegations of excessive force properly, and attempt[s] to cover-up the unconstitutional conduct of . . . subordinates by exonerating the officers" and blaming the victim of the use of force, have been held to "support the plausible inference that in the execution of [her] job functions, [the supervisor] at least knowingly acquiesced in the unconstitutional conduct of [the subordinate] Officers." *Peatross*, 818 F.3d at 243. Accordingly, for purposes of initial review, Plaintiff's excessive force/failure-to-protect claim is adequately alleged and may proceed against Defendant Lopez.

Finally, although Warden Byrd is named as a Defendant who failed to protect Plaintiff, the allegations against him—both with respect to the failure-to-protect claim and with respect to the other claims asserting his liability as a supervisor—do not identify any personal involvement he had in overseeing the actions of subordinate officers, or in formulating or implementing any policy at TTCC that is alleged to have produced a violation of Plaintiff's rights. Plaintiff cannot recover damages against Warden Byrd in his individual capacity under a theory of *respondeat superior*— i.e., based solely on Byrd's authority as warden of TTCC—but only upon "allege[d] facts showing personal involvement." *Hammonds v. L.P.N. John*, No. 3:15-cv-01141, 2016 WL 109976, at *3 (M.D. Tenn. Jan. 8, 2016); *see Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009) ("Section 1983 liability must be premised on more than mere *respondeat superior*, the right to control one's employees."). Nor can a supervisor be held liable under § 1983 for failing to train the offending subordinates "unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Everson*, 556 F.3d at 495 (citation and internal quotation marks omitted). Because Warden Byrd is not in any way alleged to have been personally involved in the violation of Plaintiff's rights, the individual-capacity claims against him must be

dismissed. And because an official-capacity claim is equivalent to a claim against the official's employer, *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003), and Warden Byrd's employer, CoreCivic, is already a named Defendant here, the claim against Byrd in his official capacity will be dismissed as redundant. *See J.H. v. Williamson Cnty., Tennessee*, 951 F.3d 709, 723 n.4 (6th Cir. 2020) (citing *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) ("Where the entity is named as a defendant, an official-capacity claim is redundant.")).

    2. Retaliation

"A First Amendment retaliation claim has three elements: (1) the plaintiff engaged in protected conduct [i.e., constitutionally protected speech]; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct." *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 759 (6th Cir. 2022) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). Plaintiff alleges that the protected speech for which he was, in retaliation, maced and otherwise assaulted was his verbal inquiry concerning Defendants Dillon, Rosario, and Burries's authority to conduct a search of his cell based only upon suspicion that he was masturbating. He alleges as follows:

> Defendant Dillon then stated to Plaintiff Hudson[,] "You know why we're doing a cell search[] . . . []because I saw you jacking off." Plaintiff Hudson quoted inmate handbook policies that permit an inmate to inquire into officers['] orders. This was done because the Defendants had no legitimate right to conduct a cell search for alleged manual masturbation. Plaintiff further asked to speak with the shift supervisor. As Plaintiff Hudson was making [this] request to speak to the appropriate staff for resolution Defendant Dillon maliciously and sadistically sprayed "mace" into Plaintiff Hudson's mouth, face, and eyes. . . .

(Am. Compl., at 12 ¶¶ 16–18.)

Liberally construing these allegations in Plaintiff's favor, the Court finds, for purposes of initial review, that he engaged in protected conduct. In requesting to speak with the shift supervisor

to resolve a dispute he raised pursuant to a right granted by the inmate handbook, Plaintiff engaged a process that approximates "pursuing a grievance about prison conditions and seeking redress of that grievance," which is no less protected because he "pursued his grievance orally, rather than in writing." *Maben v. Thelen*, 887 F.3d 252, 264–65 (6th Cir. 2018). At this early stage, the Court finds that Plaintiff has sufficiently alleged protected conduct and an adverse action motivated by that conduct, such that his retaliation claim can go forward. This claim will be allowed to proceed against Defendants Dillon, Rosario, and Burries, as well as against Defendant Lopez, who for purposes of initial review "at least knowingly acquiesced" in the retaliation by allegedly transferring Plaintiff to segregation in support of "[her] officers" and their response, and by conspiring with Rosario "to file a [false] disciplinary report." (Am. Compl., at 22 ¶¶ 110–11, 24 ¶¶125–26);[1] *cf. Peatross*, 818 F.3d at 243 (discussing sufficiency of allegations to show at least knowing acquiescence where supervisor not only failed to investigate incident, but attempted a "cover-up . . . by making false statements to federal officials about the incident").

3. <u>Claims against CoreCivic</u>

The Amended Complaint, liberally construed, alleges that CoreCivic, the corporate operator of TTCC, violated Plaintiff's constitutional rights by (1) failing properly to train or supervise the individual correctional officers who assaulted and retaliated against him, including

---

[1] Plaintiff's allegation of a conspiracy to file a false disciplinary report is made in support of his claim, "[a]s a matter of tort law," that he was falsely arrested and imprisoned "in punitive segregation" "without any process" or "procedural protections." (Am. Compl., at 23 ¶¶ 121–22.) To the extent this claim is properly construed as claiming a violation of the Fourteenth Amendment's guarantee of procedural due process, it fails to state a plausible claim because the Amended Complaint shows that Plaintiff received notice of the disciplinary report for "Incident # 01476055," dated January 31, 2021 (Doc. No. 10-1 at 58–60), responded to it in a grievance dated February 3, 2021 (*id.* at 62–65), and had his guilt determined at a hearing before "Hearing Officer f/n/u Huntley," who "concurred with the officers['] report." (Am. Compl., at 24 ¶ 127); *see Tate v. Quintana*, No. 18-6179, 2019 WL 5866596, at *1 (6th Cir. May 22, 2019) (due process rights in connection with a disciplinary hearing are satisfied when inmate receives "notice of the charges, an opportunity to present evidence, and a written decision explaining the finding of guilt") (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974)). Plaintiff does not allege any irregularities in these disciplinary proceedings that would support a plausible due process claim.

by failing to train Officer Dillon on the use of "CS - Orthoclorobenzal Malononitrile (irritant gas) in accordance with TDOC/TTCC Policy #506.08B.6.a(1)(2)" (Am. Compl., at 25 ¶ 136); (2) condoning the destruction or loss of his property by either deferring to the individual Defendants' misuse of authority or negligently failing to prevent other inmates from accessing his cell after he was escorted away from the unit (*id.* at 28 ¶¶148–49); (3) allowing the search of his cell solely because he was witnessed masturbating—an unjustifiable reason to invade his limited privacy right within his cell (*id.* at 28–29); (4) condoning the denial of necessary medical care to inmates at TTCC, as evidenced by the delays Plaintiff experienced in receiving dental care and prescription eyeglasses (*id.* at 30–32); and (5) being deliberately indifferent to inmates' psychological needs by housing mentally ill inmates in the general population and condoning its female employees' practice of voyeuristic encouragement or solicitation of inmate masturbation in their presence (known at TTCC as "gunning"), which is a disciplinary offense for inmates (*id.* at 33–37).

There is no question that CoreCivic is a state actor for purposes of Section 1983 because it performs the traditional state function of operating a prison. *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). The standards for assessing municipal liability are applied to claims against private corporations that operate prisons. *Ogbeiwi v. CoreCivic Am.*, No. 1:20-cv-01094-STA-cgc, 2021 WL 2144326, at *2 (W.D. Tenn. May 26, 2021) (citing *Thomas v. Coble*, 55 F. App'x 748, 748–49 (6th Cir. 2003)). Consistent with those standards, CoreCivic cannot be held liable under a theory of *respondeat superior* or vicarious liability, but only upon a showing that a corporate policy or custom "was the moving force behind the deprivation of the plaintiff's rights." *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) (quoting *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)).

The allegations of the Amended Complaint do not support the reasonable inference that any CoreCivic policy or custom was the moving force behind any of the aforementioned deprivations, with one exception: that CoreCivic has a policy of confining mentally ill inmates with the general population and a custom of ignoring its female officers' encouragement of "gunning," which Plaintiff alleges subjects him to an unreasonable risk of harm because he is unable to resist or control his impulse to masturbate due to mental illness (Am. Compl., at 29 ¶ 157, 35 ¶ 180), and which violates his right under the Eighth Amendment "to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well being." *Battle v. Anderson*, 564 F.2d 388, 403 (10th Cir. 1977) (quoted in Am. Compl., at 35 ¶ 179). Plaintiff supports this claim with allegations that CoreCivic has underreported the number of sexual misconduct allegations made at TTCC; that TTCC officials have selectively enforced the prison rule against "gunning"; and that CoreCivic is "aware of the female employees that were terminated for their conduct in violation of Corporate Policy #502.06 et seq., and the continued pattern and practice of staff[-]on[-]inmate voyeurism, and/or sexual abuse." (Am. Compl., at 35–36.) At least for purposes of initial review, these allegations are sufficient to state a colorable Eighth Amendment claim that will proceed against CoreCivic.

The remaining four claims against CoreCivic ascribe the particular harms that befell Plaintiff to a failure of corporate oversight, rather than to the execution of a definable corporate policy or custom. Specifically, the Amended Complaint asserts that Defendant Dillon's misuse of chemical spray indicates CoreCivic's failure to ensure proper training; that the theft or destruction of Plaintiff's property indicates CoreCivic's failure to enact rules that ensure against such losses; that the "factual dispute over whether the search" of his cell "was routine or conducted to harass plaintiff" (*id.* at 29 ¶ 153) indicates CoreCivic's failure to prevent the invasion of inmates' limited

privacy rights in their cells; and, that the delays in responding to Plaintiff's needs for dental care and eyeglasses indicate CoreCivic's failure to provide for its inmates' needs for medical care. These claims—which distill to the claim that CoreCivic must have, as Plaintiff puts it, "created a policy or custom under which unconstitutional practices occurred" (*id.* at 28 ¶ 146)—all essentially seek to impose *respondeat superior* liability, and thus fail to state a viable claim under § 1983. *See Savoie*, 673 F.3d at 494.

  4. <u>Claims against remaining Defendants</u>

  Plaintiff claims that his rights were violated when TTCC officials were granted "wide-rang[ing] deference" to act as they did "under color of the statutes, ordinances, customs, policies, and usage of the State of Tennessee, County of Trousdale, City of Hartsville, and the Tennessee Department of Correction (by contract)." (Am. Compl., at 40–41 ¶ 3.) This vague assertion is the lone allegation against the State of Tennessee, County of Trousdale, and City of Hartsville, which are not named in any of the Amended Complaint's assertions of particular claims or otherwise mentioned therein. The only possible reference to these Defendants' liability is in Plaintiff's state-law claim of negligence against "All Defendants" for "breach[ing] their respective duty or duties by allowing their conduct or inaction to all fall below the standard of care . . . owed to Plaintiff" and "proximately caus[ing] compensable injury to [him]." (*Id.* at 38.) Such "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," are insufficient to support a plausible claim to relief under any theory. *Iqbal*, 556 U.S. at 663. Defendants State of Tennessee, County of Trousdale, and City of Hartsville will be dismissed from this action.

  Plaintiff does assert a constitutional claim for damages against TDOC. (*Id.* 33–37, 41 ¶ 6.) TDOC, however, "is not a 'person' for purposes of Section 1983 liability . . . [but] is an agency of the State of Tennessee and, as such, is entitled to Eleventh Amendment immunity" from suit for

money damages. *Vick v. Core Civic*, 329 F. Supp. 3d 426, 450 (M.D. Tenn. 2018) (citing *Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997)). Accordingly, TDOC will also be dismissed from this action.

### III. CONCLUSION

As explained above, the Court finds that the Amended Complaint states nonfrivolous claims against Defendants CoreCivic, Dillon, Rosario, Burries, and Lopez. Accordingly, the Clerk is **INSTRUCTED** to send Plaintiff service packets (blank summonses and USM 285 forms) for each of these five Defendants. Plaintiff **MUST** complete the service packets and return them to the Clerk's Office within **21 DAYS** of the date of this Order. Upon return of the completed service packets, **PROCESS SHALL ISSUE**.

All other Defendants are **DISMISSED** from this action.

The Court's determination that the Amended Complaint states colorable claims for purposes of this initial screening does not preclude the Court from dismissing any claim at any time for the reasons set forth in 28 U.S.C. § 1915(e)(2), nor does it preclude any Defendant from filing a motion to dismiss any claim under Federal Rule of Civil Procedure 12.

This action is **REFERRED** to the Magistrate Judge to enter a scheduling order for the management of the case, to dispose or recommend disposition of any pretrial motions under 28 U.S.C. §§ 636(b)(1)(A) and (B), and to conduct further proceedings, if necessary, under Rule 72(b) of the Federal Rules of Civil Procedure and the Local Rules of Court.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE